**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

REX CHAPPELL,
*Plaintiff-Appellee*,

v.

R. MANDEVILLE; T. ROSARIO,
*Defendants-Appellants*,

and

J. CASE; C. DAVIS;
C. RASMUSSEN; RODRIGUEZ,
*Defendants*.

No. 09-16251

D.C. No.
2:03-cv-00653-
GEB-KJM

OPINION

Appeal from the United States District Court
for the Eastern District of California
Garland E. Burrell, Jr., District Judge, Presiding

Argued and Submitted
August 29, 2011—San Francisco, California

Filed January 31, 2013

Before: Marsha S. Berzon and Jay S. Bybee, Circuit
Judges, and James L. Graham, Senior District Judge.[*]

Opinion by Judge Bybee;
Concurrence by Judge Graham;
Partial Dissent by Judge Berzon

## SUMMARY[**]

### Prisoner Civil Rights

The panel reversed the district court's denial of a motion
for summary judgment brought by two California state prison
officials in this 42 U.S.C. § 1983 action in which plaintiff
alleged Eighth Amendment and due process violations in
connection with his six-day placement on contraband watch.

The panel concluded that, as of April-May 2002, the law
was not clearly established as to whether the conditions that
plaintiff experienced in connection with the contraband
watch, including twenty-four hour lighting and mattress
deprivation, violated the Eighth Amendment. The panel also
concluded that plaintiff could not claim a liberty interest
under the Due Process Clause of the Fourteenth Amendment,
and it was not clearly established that he had sustained a

[*] The Honorable James L. Graham, Senior District Judge for the U.S.
District Court for the Southern District of Ohio, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

violation of a state-created liberty interest. Therefore, both prison officials were entitled to qualified immunity.

Concurring, District Judge Graham wrote separately because he disagreed with the majority's interpretation of the Supreme Court's decision in *Sandin v. Conner*, 515 U.S. 472 (1995), in the context of their analysis of plaintiff's due process claim based on a state-created liberty interest.

Dissenting in part, Judge Berzon agreed that prison officials were entitled to qualified immunity on the due process issues. Judge Berzon dissented because in her view, a reasonable officer would have known that, in combination, the twenty-four-hour bright light, the absence of a mattress, and the extensive bodily restraints risked depriving plaintiff of sleep, in violation of the Eighth Amendment.

---

**COUNSEL**

Megan R. O'Carroll, Deputy Attorney General, Sacramento, California, for Defendants-Appellants.

Caleb E. Mason, Southwestern Law School, Los Angeles, California, for Plaintiff-Appellee.

---

**OPINION**

BYBEE, Circuit Judge:

Plaintiff Rex Chappell brought a § 1983 case against various officials from California State Prison, Sacramento, alleging constitutional violations relating to his six-day

placement on contraband watch. The defendants brought a motion for summary judgment, and the district court granted the motion on some of the claims, but denied summary judgment with respect to Chappell's Eighth Amendment and due process claims against defendants R. Mandeville and T. Rosario. Mandeville and Rosario appealed. We hold that both Mandeville and Rosario are entitled to qualified immunity because the law at the time Chappell was on contraband watch did not clearly establish that their actions were unconstitutional. We therefore reverse.

## I.    FACTS AND PROCEDURAL HISTORY

Rex Chappell was a prisoner in California State Prison, Sacramento when his fianceé, Philissa Richard, came to visit him on April 28, 2002. When Richard entered the prison facilities she was wearing a ponytail hairpiece; the next day the hairpiece was discovered in a trash can near the visiting room. Prison officials then searched the entire visiting area and found spandex undergarments in the women's bathroom. Both the hairpiece and the undergarments tested positive for cocaine residue. Richard admitted that the hairpiece was hers, but an investigation did not conclude whether the undergarments also belonged to Richard. A background check revealed that Richard had a long history of felony offenses, including numerous drug offenses.

Prison staff conducted a search of Chappell and his prison cell, during which they notified Chappell that they believed that someone had introduced drugs through a hairpiece. The officials discovered three unlabelled bottles of what appeared to be eye drops in Chappell's cell. The liquid in the bottles tested positive for methamphetamine.

On April 30, 2002, Chappell was placed on contraband watch. Under prison regulations, an official who is the rank of captain or above can make the decision to place a prisoner on contraband watch if the official has reasonable cause to believe that an inmate has ingested or secreted contraband. F. Schroder was the acting facility captain at the time, but he did not remember any specific details as to how Chappell was placed on contraband watch or who made the decision. R. Mandeville, captain of the Investigative Services Unit, was in charge of the investigation but denies that he was the official who ordered contraband watch. T. Rosario was the acting warden and also would have had authority to order the watch.

Contraband watch, also known as a "body cavity search," is a temporary confinement during which a prisoner is closely monitored and his bowel movements searched to determine whether he has ingested or secreted contraband in his digestive tract. Under prison procedures, the prisoner is first searched and then dressed so as to prevent him from excreting any contraband and removing it from his clothing. The prisoner is placed in two pairs of underwear, one worn normally and the other backwards, with the underwear taped at the waist and thighs. The prisoner is also placed in two jumpsuits, one worn normally and the other backwards, with the suits taped at the thighs, ankles, waist, and upper arms. The tape on both the underwear and the jump suits is not meant to touch the skin; it is used to close off any openings in the clothing. The prisoner is then placed in waist chain restraints, which are handcuffs that are separated and chained to the side of the prisoner's waist. This prevents the prisoner from being able to reach his rectum. The waist chain restraints are adjustable and can be lengthened if necessary. The prisoner is then placed in a surveillance cell where prison

staff watch the prisoner at all times. The lights are kept on in the cell to allow staff to see the prisoner. To prevent the inmate from concealing contraband, the cell does not have any furniture other than a bed without a mattress. The prisoner is given a blanket, and receives three meals a day and beverages. When the prisoner needs to defecate he must notify the prison staff who will bring him a plastic, moveable toilet chair. Once he uses the chair, the staff will search the waste to determine if it contains contraband.

Chappell generally confirmed that these policies were applied to him while he was under contraband watch. In addition to these procedures, Chappell claims that he was also placed in ankle shackles, and chained to the bed. He complains that the waist restraints were not loosened for meals, forcing him to "eat [his] food like a dog; the temperature in the cell was very high; the cell was unventilated; and the lights were "very bright." Chappell alleged that the conditions "did in fact torture [him] mentally" and he felt like he "deteriorat[ed] mentally" during contraband watch.

After having three bowel movements that did not reveal contraband, Chappell was released from contraband watch on May 6, 2002.

Chappell brought an action under 42 U.S.C. § 1983 naming various prison officials as defendants, including Mandeville and Rosario, and alleging numerous constitutional claims. The defendants brought a motion for summary judgment, and the district court, adopting the findings and recommendations of the magistrate judge, granted the motion on some of the claims, but denied summary judgment with respect to two of Chappell's claims

against Mandeville and Rosario: (1) that the contraband watch constituted cruel and unusual punishment in violation of the Eighth Amendment, and (2) that Chappell's due process rights were violated since he was not given notice of the charges against him or an opportunity to be heard prior to being placed on contraband watch. Mandeville and Rosario appealed.

## II.   LEGAL BACKGROUND

Qualified immunity protects government officials from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Schwenk v. Hartford*, 204 F.3d 1187, 1195–96 (9th Cir. 2000) (applying qualified immunity to prison officials). Whether qualified immunity applies thus "turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012) (internal quotation marks omitted). Officials must have "fair warning" that their actions are unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *Porter v. Bowen*, 496 F.3d 1009, 1026–27 (9th Cir. 2007). If an official "reasonably believes that his or her conduct complies with the law," qualified immunity applies. *Pearson v. Callahan*, 555 U.S. 223, 244 (2009); *see also Motley v. Parks*, 432 F.3d 1072, 1077 (9th Cir. 2005) (en banc) (noting that qualified immunity will "shield[] an officer from trial when the officer reasonably misapprehends the law governing the circumstances she confronted, even if the officer's conduct was constitutionally deficient" (internal quotation marks

omitted)), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012) (en banc).

To determine whether the law was clearly established, we first look to our own binding precedent. *See Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996). If none is on point, we may consider other decisional law. *Id.*; *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1060–61 (9th Cir. 2003). We need not find that the "very action in question has previously been held unlawful," *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citation omitted), but, rather, we consider whether "a reasonable officer would have had fair notice that [the action] was unlawful, and that any mistake to the contrary would have been unreasonable." *Drummond*, 343 F.3d at 1060; *see also Hope*, 536 U.S. at 741 ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.").

In determining whether a government official should be granted qualified immunity, we view the facts in the light most favorable to the injured party. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *receded from on other grounds by Pearson*, 355 U.S. at 817–21; *see also Bryan v. MacPherson*, 630 F.3d 805, 817 (9th Cir. 2010)*.

### III.   DISCUSSION

On appeal, Mandeville and Rosario argue that they are entitled to qualified immunity on Chappell's Eighth Amendment and due process claims.[1] We agree.   Under

---

[1] We have jurisdiction to consider an interlocutory appeal of a denial of qualified immunity. *Behrens v. Pelletier*, 516 U.S. 299, 307 (1996). We review a district court's denial of summary judgment on grounds of

Chappell's version of the facts, and assuming that he has stated a claim under the Eighth and Fourteenth Amendments, the law was not clearly established on either of Chappell's claims at the time the contraband watch took place such that Mandeville and Rosario would have had fair notice that their actions were unconstitutional. Thus, Mandeville and Rosario are entitled to qualified immunity.

## A. *Chappell's Eighth Amendment Claim*

Chappell argues that the combination of conditions to which he was subjected, including twenty-four-hour lighting and mattress deprivation, violated his Eighth Amendment rights. We hold that as of April-May 2002, when Chappell was placed on contraband watch, the law was not clearly established as to whether the conditions Chappell experienced—either in isolation or combination—violated the Eighth Amendment, made applicable to the states through the Fourteenth Amendment.

### 1. Continuous lighting

With regards to continuous lighting, as of April-May 2002, we had explained generally that sufficient or "[a]dequate lighting is one of the fundamental attributes of 'adequate shelter' required by the Eighth Amendment," *Hoptowit v. Spellman*, 753 F.2d 779, 783 (9th Cir. 1985) (holding that inadequate lighting violated the Constitution), but we had only addressed constant illumination once in *Keenan v. Hall*, 83 F.3d 1083, 1088, 1090–91 (9th Cir. 1996). In *Keenan* we held that there was a triable issue of fact on a

---

qualified immunity de novo. *See Bryan*, 630 F.3d at 823; *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002).

continuous lighting claim where a prisoner was subjected to two large fluorescent lights that were kept on 24 hours a day for six months, and the prisoner claimed that the lighting caused him "'grave sleeping problems' and other and psychological problems." *Id.* at 1088, 1091. We noted that the prison officials in that case had "no legitimate penological justification for requiring inmates to suffer physical and psychological harm by living in constant illumination," *id.* at 1090 (internal quotation marks and alterations omitted), relying on a district court decision, *LeMaire v. Maass*, 745 F. Supp. 623, 636 (D. Or. 1990), *vacated*, 12 F.3d 1444, 1459 (9th Cir. 1993) (vacating, in part, because the state agreed to change the lighting).

*Keenan* did not clearly establish that Mandeville's and Rosario's actions were unconstitutional because the facts of *Keenan* are distinguishable. In *Keenan*, the prisoner claimed sleep deprivation over a period of six months; Chappell's claim is based on seven days of contraband watch, and he did not claim that he was sleep deprived.[2]

Moreover, *Keenan* did not clearly establish that constant illumination violates the Eighth Amendment when done for a legitimate penological purpose. *Keenan* noted that no legitimate penological justification had been offered in that case. *Keenan*, 83 F.3d at 1090. Furthermore, the district court case on which *Keenan* relied, *LeMaire*, acknowledged that a need to see into cells as a security measure could be a

---

[2] As Judge Berzon acknowledges in her dissent, Chappell "did not expressly allege" that the contraband watch caused him sleeping problems. Dissent Op. at 35. The only statement relating to sleep in the Amended Complaint is that Chappell was "deteriorating mentally" and had to "attempt to sleep that way."

legitimate penological justification, but concluded that the penological justification offered in that case was insufficient because there was no evidence that the staff "need[ed] to see into the quiet cells for 24 hours per day, or that they [were] even near the quiet cells for 24 hours per day." *LeMaire*, 745 F. Supp. at 636.[3]  In contrast, the record here reflects a clear penological purpose. Prison officials suspected that Chappell had secreted contraband in his body and kept the lights on so that they could monitor Chappell 24 hours a day to prevent him from disposing of the contraband. The officers would have been unable to perform contraband watch if they could not see into his cell. Thus, our case law did not clearly establish that in April-May 2002 that the constant illumination of Chappell's cell was unconstitutional.

In addition, even if Chappell and Mandeville had looked to other decisional law for guidance they still would not have had fair notice that their actions were unconstitutional. Indeed, one district court case surveying the state of the law explained that there have been "mixed results" on continuous lighting claims because "such cases are fact-driven." *Shepherd v. Ault*, 982 F. Supp. 643, 645 (N.D. Iowa 1997). In that case the court held that prisoners raised a genuine issue of material fact on their Eighth Amendment claims where two prisoners spent 283 days and 550 days, respectively, under

---

[3]  Judge Berzon points out that *Keenan* says that "'there is no legitimate penological justification for requiring inmates to suffer physical and psychological harm by living in constant illumination.'" *Keenan*, 83 F.3d at 1090 (quoting *LeMaire*, 745 F. Supp. at 636); *see* Dissent Op. at 36. Although Judge Berzon reads *Keenan* as broadly stating that penological reasons cannot justify constant illumination under any circumstances, *Keenan* itself was quoting from *LeMaire*, in which that court left open the possibility that a legitimate penological purpose could justify constant illumination. 745 F. Supp. at 636.

bright lighting, and one of those two prisoners claimed that he had difficulty sleeping. *Id.* at 647–49. Under different circumstances, however, other courts had concluded that the effects of continuous lighting were not severe enough to constitute a violation of the Eighth Amendment. *See, e.g.*, *Zatko v. Rowland*, 835 F. Supp. 1174, 1181 (N.D. Cal 1993) (noting that continuous light depriving a prisoner of sleep would be unconstitutional but dismissing the claim because the officers did not use the light to try to keep the prisoner awake); *Williams v. Ward*, 567 F. Supp. 10, 13, 15 (E.D.N.Y 1982) (holding that keeping hallway lights on all night did not violate a constitutional right even where plaintiff claimed inability to sleep); *Cassidy v. Superintendent*, 392 F. Supp. 330, 334 (W.D. Va. 1975) (holding that "flood[ing] a cell with a bright light twenty-four hours a day" was constitutional where the lights allowed guards to check the cells, the lights were not bright enough to interfere with the prisoners' sleep, the prisoner chose to stay in that particular cell, and the light was not used in a "vindictive manner"), *aff'd in part, rev'd in part and remanded*, 529 F.2d 514 (4th Cir. 1975) (grounds for reversal not provided); *Bauer v. Sielaff*, 372 F. Supp. 1104, 1110 (E.D. Pa. 1974) ("[T]he discomfort of lights at night do[es] not constitute a constitutional deprivation.").

Moreover, in a different context—that of pre-trial detainees bringing claims under the Due Process Clause of the Fourteenth Amendment, which protects an even broader class of interests than the Eighth Amendment, *see Redman v. Cnty. of San Diego*, 942 F.2d 1435, 1440 n.7 (9th Cir. 1991) (explaining that "while the eighth amendment proscribes cruel and unusual punishment for convicted inmates, the due process clause of the fourteenth amendment proscribes any punishment of pretrial detainees"); *see also Bell v. Wolfish*,

441 U.S. 520, 535 n.16 (1979),—other courts had held that constant lighting can serve a legitimate penological purpose. *See, e.g.*, *Ferguson v. Cape Girardeau County*, 88 F.3d 647, 650 (8th Cir. 1996) (holding where bright lights were on continuously and the plaintiff was observed sleeping that the "totality of the circumstances—which include the relative short duration of the confinement, the necessity to keep the detainee under observation for both his medical condition as well as general safety concerns, and the amount of time that he spent out of the cell—supports the assertion of legitimate governmental interest," and thus no constitutional violation occurred); *O'Donnell v. Thomas*, 826 F.2d 788, 790 (8th Cir. 1987) ("[C]ontinuous lighting in [a] holding cell was not unreasonable given the need for jail security and the need to monitor [the prisoner]."); *Fillmore v. Ordonez*, 829 F. Supp. 1544, 1568 (D. Kan. 1993) (holding that a continuous low-intensity light was "reasonably related to the maintenance of internal security of the Osage County jail"), *aff'd*, 17 F.3d 1436 (10th Cir. 1994), *abrogated in part on other grounds as recognized by Williams v. Weber*, 905 F. Supp. 1502, 1512 n.13 (D. Kan. 1995).

Overall, as of April-May 2002, other jurisdictions had made decisions on continuous lighting based on various factors, including whether the lights caused sleep deprivation, *Shepherd*, 982 F. Supp. at 647–49; *Zatko*, 835 F. Supp. at 1181; *Cassidy*, 392 F. Supp. at 334; the brightness and intensity of the lights, *id.*; the duration of exposure, *Shepherd*, 982 F. Supp. at 648–49; *Ferguson*, 88 F.3d at 650; whether a legitimate penological justification existed, *Cassidy*, 392 F. Supp. at 334; *Ferguson*, 88 F.3d at 650; *Fillmore*, 829 F. Supp. at 1568; and whether prison officials were trying to keep the prisoner awake, *Zatko*, 835 F. Supp. at 1181. The results of these cases were mixed. A large majority of the

courts, however, concluded that the there was no Eighth Amendment violation.

Since, at the time Chappell's contraband watch took place, no court had ruled on whether contraband watch constitutes a legitimate penological purpose that would justify continuous lighting, and Chappell was subjected to continuous lighting for only seven days and did not claim that he was deprived of sleep or intentionally kept awake, Mandeville and Rosario did not have fair notice that their actions were unconstitutional. Given our decision in *Keenan* and the decisional law in other circuits, we have some doubt that the conditions that Chappell experienced under contraband watch even amounted to Eighth Amendment violation, but we do not reach this question since, at a minimum, the law was not clearly established that the contraband watch was unconstitutional and thus Chappell's Eighth Amendment claim can be resolved on qualified immunity grounds.

### 2. Mattress deprivation

The law was not clearly established as of April-May 2002 with regards to mattress deprivation either. We had held that mattress deprivation "for only one night [was] insufficient to state an eighth amendment violation," *Hernandez v. Denton*, 861 F.2d 1421, 1424 (9th Cir. 1988), *vacated on other grounds*, 493 U.S. 801, (1989), but had not made clear whether mattress deprivation for longer could state an Eighth Amendment claim. Although we had indicated in an unpublished decision that a prisoner who was "forced to sleep on the floor, without a mattress, next to broken toilets and overflowing showers" for an unspecified period of time and "had to wear the same clothes for 45 days" might have an

Eighth Amendment claim, *Seagrave v. Hennessey*, No. 92-17121, 1994 U.S. App. LEXIS 4321, at \*4–6 (9th Cir. Mar. 2, 1994), we had also explained that the Supreme Court's observation that "a condition of confinement which does not violate the Eighth Amendment when it exists for just a few days may constitute a violation when it exists for 'weeks or months,' . . . [did] not provide clear guidance to prison officials as to how much time must pass before requiring a prisoner to sleep on the floor of a cell without a mattress [may] constitute an Eighth Amendment violation." *Schroeder v. Kaplan*, 60 F.3d 834, 1995 WL 398878, at \*2 (9th Cir. July 7, 1995) (unpublished) (quoting *Hutto v. Finley*, 437 U.S. 678, 686–87 (1978)). We also held in *Schroeder* that, where a prisoner was forced to sleep on a cold concrete floor for most of a month, the law was not clearly established on whether mattress deprivation was an Eighth Amendment violation. *Id.* at \*2–3. We concluded that there was no binding precedent in our circuit, that decisional law in other jurisdictions was inconsistent, and that those courts that found a constitutional violation had additional egregious facts supporting an Eighth Amendment claim. *Id.* at \*2 (citing cases that included additional factors such as "extreme cold, lack of sanitary conditions, solitary confinement, inadequate clothing, or improper diet").

If Mandeville and Rosario had looked to *Schroeder* they would not have had notice on whether mattress deprivation constituted an Eighth Amendment violation. This is particularly true because the facts surrounding Chappell's confinement are much less severe than those in *Schroeder.* Not only was Chappell forced to sleep without a mattress for only seven days, which is significantly less time than the prisoner in *Schroeder* who went a month without a mattress, but Chappell had a bed and a blanket. Mandeville and

Rosario also submitted evidence that there was a legitimate purpose for not allowing Chappell to have a mattress—no mattress or furniture was allowed into the cell to prevent the inmate from concealing contraband.

We did not hear any cases on mattress deprivation between July 1995, when *Schroeder* was decided, and April-May 2002, when Chappell was placed on contraband watch. The law of other jurisdictions between July 1995 and April-May 2002 would not have provided Chappell and Rosario with any further clarity either. *Compare Jones v. Toombs*, 77 F.3d 482, 1996 WL 67750 (6th Cir. Feb. 15, 1996) (unpublished) (holding that two weeks without a mattress did not violate the Eighth Amendment), *O'Leary v. Iowa State Men's Reformatory*, 79 F.3d 82, 84 (8th Cir. 1996) (holding that three days without a blanket and a mattress during a disciplinary confinement did not violate the Eighth Amendment), *Castro v. Chesney*, No. CIV. A. 97-4983, 1998 WL 767467, at *8 (E.D. Pa. Nov. 3, 1998) (holding that two days without a mattress and a blanket would not rise to a constitutional violation), *and Johnson v. Zanon*, 543 N.W. 2d 868, 1995 WL 576891, at *1–2 (Wis. Ct. App. Oct. 3, 1995) (unpublished) (holding that three days without a mattress did not support an Eighth Amendment claim), *with DeSpain v. Uphoff*, 229 F.3d 1162, 2000 WL 1228003 (10th Cir. Aug. 30, 2000) (unpublished) (holding that three days without a mattress, bedding, or clothes in an unheated cell was sufficient to withstand summary judgment on prisoner's Eighth Amendment claim), *Rhoden v. Godinez*, No. 95 C 5085, 1996 WL 559954, at *4 (N.D. Ill. Sept. 30, 1996) (unpublished) (holding that several months without bed linen and a mattress could sustain an Eighth Amendment claim, but noting that the deprivation could have been "justified by legitimate security concerns"), *and Gordon v. Sheahan*, No.

96 C 1784, 1997 WL 136699, at \*7 (N.D. Ill. Mar. 24, 1997) (noting that "[r]equiring even a convicted prisoner to sleep without a mattress for more than a few days could" violate the Eighth Amendment). Thus, our conclusion in *Schroeder* that the law was not clearly established was still true in April-May 2002. Mandeville and Rosario would not have had fair notice that mattress deprivation alone would have constituted a constitutional violation.

### 3. Combination of conditions

Viewing the facts in the light most favorable to Chappell, in addition to the continuous lighting and the mattress deprivation, Chappell alleged that he was taped into two pairs of underwear and jumpsuits, placed in a hot cell with no ventilation, chained to an iron bed, shackled at the ankles and waist so that he could not move his arms, and was forced to eat like a dog. The district court adopted the magistrate's finding that these conditions had the "mutually enforcing effect of sleep deprivation that any reasonable officer would know comprised unconstitutional conditions of confinement." We disagree.

It is true that "[s]*ome* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). But this only applies when the conditions "have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Id.* Chappell has not alleged the deprivation of any such need here. He did not specifically claim that he was sleep deprived during the

contraband watch, but only that he was "deteriorating mentally" and had to "attempt to sleep that way."

Moreover, the focus of the inquiry under qualified immunity is whether the defendants had fair notice that their actions were unconstitutional. In April-May 2002, there were no cases in this jurisdiction that involved a contraband watch similar to the one that occurred here. The only factually similar case was *Mendoza v. Blodgett*, which involved a "feces watch" where the prisoner was placed in a "dry cell" wearing only a pair of shorts and not given a blanket. *Mendoza v. Blodgett*, 1990 WL 263527, at *4–5 (E.D. Wash. Dec. 21, 1990), *aff'd on other grounds*, 960 F.2d 1425, 1427 n.3 (9th Cir. 1992) (noting that Mendoza did not renew his Eighth Amendment Claim). In that case, the district court held that these circumstances did not amount to an Eighth Amendment violation, noting that the purpose of these conditions was "to insure that [the prisoner was] unable to conceal or destroy any contraband passed through a bowel movement." *Id.* at *5.

Case law in other jurisdictions would not have provided any further clarity. The Seventh Circuit held similarly that placement of a prisoner into a dry cell for three days, during which he was unable to wash his hands and denied personal hygiene items, did not violate the Eighth Amendment, particularly since the prisoner had been "confined to the dry cell to serve a legitimate penological interest." *Jihad v. Wright*, 124 F.3d 204, 1997 WL 471345, at *2 (7th Cir. Aug. 14, 1997) (unpublished); *see also Stewart v. Wright*, 101 F.3d 704, 1996 WL 665978, at *1 (7th Cir. Nov. 14, 1996) (unpublished) (holding that a three-day confinement to dry cell without toilet paper, toothbrush, toothpaste, in a "filthy roach-infested cell" did not violate the Eighth Amendment).

Although the conditions here were more severe than those in the feces watch cases, as previously explained, Mandeville and Rosario presented evidence that the contraband watch conditions were engineered with an eye to accomplishing the same penological purpose as the feces watch cases—discovering secreted contraband. Given this important penological purpose and the state of the law at the time, the contraband watch was not "such a far cry from what any reasonable prison official could have believed was legal that the defendants knew or should have known they were breaking the law." *Sorrels*, 290 F.3d at 971; *see also Messerschmidt*, 132 S. Ct. at 1244 ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." (internal quotation marks omitted)).

Because no court had held that conditions similar to those Chappell experienced were unconstitutional in the face of the important penological purpose of discovering contraband, we hold that Mandeville and Rosario are entitled to qualified immunity on Chappell's Eighth Amendment claim.[4]

---

[4]   Because Mandeville and Rosario are entitled to qualified immunity, we do not consider whether these conditions amounted to an actual Eighth Amendment violation. Our holding is limited to a finding that the law was not clearly established as to whether the conditions that Chappell was subjected to, both in isolation and combination, violated the Eighth Amendment. *See Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (explaining that a court "may grant qualified immunity on the ground that a purported right was not 'clearly established' by prior case law, without resolving the often more difficult question whether the purported right exists at all" to avoid deciding constitutional questions unnecessarily); *see also Pearson*, 555 U.S. at 236–37, 241.

**B.** *Chappell's Due Process Claim*

Chappell also claims that his right to due process was violated because he was not provided with an opportunity to be heard by the official who ordered the contraband watch. For Chappell to be entitled to due process we first must find that he has a liberty interest triggering procedural protections. A liberty interest can arise from one of two sources—either the Due Process Clause of the Fourteenth Amendment or state law. *Mendoza*, 960 F.2d at 1428. Since Chappell does not make clear whether he bases his claim on the Due Process Clause of the Fourteenth Amendment or whether he claims a state-created liberty interest, we analyze both theories.

### 1.   Liberty interest under the Fourteenth Amendment

We conclude that the Due Process Clause of the Fourteenth Amendment does not afford Chappell a liberty interest. "[L]awfully incarcerated persons retain only a narrow range of protected liberty interests." *Hewitt v. Helms*, 459 U.S. 460, 467 (1983). Thus, "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Montanye v. Haymes*, 427 U.S. 236, 242 (1976). Transfer to less amenable quarters for non-punitive reasons has been held to be "ordinarily contemplated by a prison sentence." *Hewitt*, 459 U.S. at 468; *see also Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (explaining that "[t]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement"). Indeed, the Due Process Clause does not protect against all changes in conditions of confinement even

where they "hav[e] a substantial adverse impact on the prisoner involved." *Meachum v. Fano*, 427 U.S. 215, 224 (1976).

An investigative contraband watch is the type of condition of confinement that is ordinarily contemplated by the sentence imposed. Only the most extreme changes in the conditions of confinement have been found to directly invoke the protections of the Due Process Clause, such as involuntary commitment to a mental institution, *see Vitek v. Jones*, 445 U.S. 480, 493–94 (1980), or the forced administration of psychotropic drugs, *Washington v. Harper*, 494 U.S. 210, 221–22 (1990). Since a temporary contraband watch does not rise to this level, Chappell cannot directly claim a liberty interest under the Due Process Clause of the Fourteenth Amendment.

## 2.  State-created liberty interest

In addition, the claim that Mandeville and Rosario are liable to Chappell for damages based on a state-created liberty interest also fails. Since the law was not clearly established on whether a state-created liberty interest existed with regard to the contraband watch when it took place, Mandeville and Rosario are also entitled to qualified immunity on Chappell's due process claim, and so cannot be liable for damages.

### a.  *Sandin* and the substantive predicates test

A state may create a liberty interest through statutes, prison regulations, and policies. *Wilkinson*, 545 U.S. at 222; *Neal v. Shimoda*, 131 F.3d 818, 827 (9th Cir. 1997). For many years we analyzed whether a state had created a liberty

interest in its prison regulations under the "substantive predicates approach," based on the Supreme Court's decision in *Hewitt v. Helms*, 459 U.S. 460. This approach asked whether the state has placed "substantive limitations on official discretion," through "adopting regulations which establish 'substantive predicates' to govern official decisionmaking," by using "explicitly mandatory" rather than discretionary language. *Mendoza*, 960 F.2d at 1428–29; *see also Hewitt*, 459 U.S. at 471–72.

Our approach to state-created liberty interests changed, however, in response to the Court's decision in *Sandin v. Conner*, 515 U.S. 472 (1995)*. In *Sandin*, the Court criticized its previous "substantive predicates" approach as applied to changes in prison conditions, asserting that "the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause." *Id.* at 480–83. *Sandin* then refocused the inquiry on whether the action "imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 483–84. In applying *Sandin*, we have concluded that the discretionary/mandatory substantive predicates approach was "abandoned" or "overruled" in *Sandin*, and our decisions have focused only on the "atypical and significant hardship" test, even in the face of relevant prison regulations. *See, e.g.*, *Myron v. Terhune*, 476 F.3d 716, 719 (9th Cir. 2007) (noting that *Sandin* abandoned the mandatory/discretionary methodology for convicted prisoners); *McQuillion v. Duncan*, 306 F.3d 895, 903 (9th Cir. 2002) (noting that *Sandin* "abandon[ed] the 'mandatory language' framework"); *Duffy v. Riveland*, 98 F.3d 447, 457 (9th Cir. 1996) (explaining that the mandatory language "test for the existence of state-created liberty interests . . . has been abandoned by the

Supreme Court" in *Sandin*); *Mitchell v. Dupnik*, 75 F.3d 517, 522 (9th Cir. 1996) (noting that *Sandin* criticized the "substantive predicates approach" and refocused the test); *Mujahid v. Meyer*, 59 F.3d 931, 932 (9th Cir. 1995) (noting that *Sandin* "overruled" Ninth Circuit cases that have taken a substantive predicate/mandatory language approach); *cf. Neal*, 131 F.3d at 828–29 (noting, before *Wilkinson*, that the substantive predicates test had "likely . . . been disapproved" of in *Sandin* but holding that a state program likely created a liberty interest in any event).[5]

*Sandin* and its progeny made this much clear: to find a violation of a state-created liberty interest the hardship imposed on the prisoner must be "atypical and significant . . . in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483–84.

### b. Atypical and significant hardship test

We conclude that the law did not clearly establish that the conditions that Chappell experienced constituted an "atypical and significant hardship." At the time of Chappell's

---

[5]    In contrast to the shift regarding prison conditions and discipline cases,  the "mandatory language" analysis of *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1 (1979), and *Bd. of Pardons v. Allen*, 482 U.S. 369 (1987), retains continuing vitality in cases concerning prisoners' state-created liberty interest in parole. *See Swarthout v. Cooke*, 131 S. Ct. 859, 861–63 (2011) (per curiam) (characterizing our holding that California law creates a liberty interest in parole as "a reasonable application" of *Allen* and *Greenholtz*, but holding that prisoners have no constitutionally protected liberty interest in factual support for parole decisions); *see also, e.g.*, *Miller v. Or. Bd. of Parole & Post Prison Supervision*, 642 F.3d 711, 714–16 (9th Cir. 2011); *Roberts v. Hartley*, 640 F.3d 1042, 1045 (9th Cir. 2011).

contraband watch, we had explained that the "atypical and significant hardship" is context-dependent and requires "fact by fact consideration," *Keenan*, 83 F.3d at 1089. We confirmed this only a year after the contraband watch took place, noting that "[t]here is no single standard for determining whether a prison hardship is atypical and significant" and that analysis under this standard requires "case by case, fact by fact consideration." *Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003) (internal quotation marks omitted). Indeed, we had noted prior to April-May 2002 that at least three factors from *Sandin* should be considered in each case: (1) whether the conditions of confinement "mirrored those conditions imposed upon inmates in analogous *discretionary* confinement settings, namely administrative segregation and protective custody," (2) the duration and intensity of the conditions of confinement; and (3) whether the change in confinement would "inevitably affect the duration of [the prisoner's] sentence." *Pifer v. Marshall*, 139 F.3d 907, 1998 WL 81335, at *1 n.3 (9th Cir. Feb. 24, 1998) (unpublished) (internal quotation marks omitted).

We are not aware of any court that, as of April-May 2002, had applied the *Sandin* test, or similar temporary, investigatory confinement, to hold that a contraband watch was an "atypical and significant hardship" apart from the ordinary conditions of prison management. The only similar case in which we had considered a due process claim was *Mendoza*, where the prisoner had been placed on "feces watch." *Mendoza*, 960 F.2d at 1427–29. That case, however, was pre-*Sandin* and thus did not apply the "atypical and significant hardship" test. *Id.* Moreover, no other jurisdiction had applied the "atypical and significant hardship" test to any factually similar cases before April-May 2002 either.

Because there was no case law holding that contraband watch, or any similar regime, is an "atypical and significant hardship," and the "atypical and significant hardship" test is so fact-specific, Mandeville and Rosario did not have fair notice on whether the conditions that Chappell experienced violated a state-created liberty interest that would trigger due process protections. Thus, Mandeville and Rosario are also entitled to qualified immunity on Chappell's due process claim.

## IV.    CONCLUSION

We conclude that, as of April-May 2002, the law was not clearly established as to whether the conditions that Chappell experienced in connection with the contraband watch violated the Eighth Amendment. Moreover, we conclude that Chappell cannot claim a liberty interest under the Due Process Clause of the Fourteenth Amendment, and it was not clearly established that Chappell had sustained a violation of a state-created liberty interest. Therefore, both Mandeville and Rosario are entitled to qualified immunity. In light of this conclusion, we do not decide whether Chappell's claims, if proven, would violate the Eighth or Fourteenth Amendments.

**REVERSED.**

---

GRAHAM, Senior District Judge, concurring:

I join the panel's opinion with the exception of Section III.B.2. I write separately because I disagree with my colleagues' interpretation of the Supreme Court's decision in *Sandin v. Conner*, 515 U.S. 472 (1995), in the context of their

analysis of Chappell's due process claim based on a state-created liberty interest.

I believe that subjecting Chappell to contraband watch did not violate his rights under the Due Process Clause. The due process analysis should end there because Chappell has identified no state statute or regulation which limits the discretion of prison officials to subject him to this kind of temporary investigatory confinement. In the absence of such a state statute or regulation, there can be no state-created liberty interest.

My colleagues apparently believe that *Sandin* changed this requirement and that post-*Sandin* any change in conditions of confinement which imposes an "atypical and significant hardship" may give rise to a violation of a state-created liberty interest. I fail to understand how it could be said that a state has "created" a liberty interest by imposing harsher conditions of confinement. In effect, my colleagues have interpreted *Sandin* to conflate the state-created liberty interest analysis so as to give a state prisoner direct access to the protections of the Due Process Clause if he can show that the conditions of his confinement impose an "atypical and significant hardship." This is a radical change in due process jurisprudence and a significant departure from previous limitations. *See Meachum v. Fano*, 427 U.S. 215, 224 (1976) (rejecting the proposition that "[a]ny change in the conditions of confinement having a substantial adverse impact on the prisoner involved is sufficient to invoke the protections of the Due Process Clause"). Cases in which the Supreme Court has found that conditions of confinement amounted to a violation of the Due Process Clause have been limited to such extremes as involuntary commitment to a mental institution and the forced administration of psychotropic drugs. *See*

*Vitek v. Jones*, 445 U.S. 480 (1980) and *Washington v. Harper*, 494 U.S. 210 (1990).

A state may create a liberty interest through statutes and prison regulations and may thereby trigger due process protections. *Wilkinson v. Austin*, 545 U.S. 209, 222 (2005); *Neal v. Shimoda*, 131 F.3d 818, 827 (9th Cir. 1997). The determination of whether a state-created liberty interest exists is a two-part inquiry. First, there must be a regulation that places "substantive limitations on official discretion." *Mendoza v. Blodgett*, 960 F.2d 1425, 1428 (9th Cir. 1992) (citing *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 462 (1989)). In *Mendoza*, the court explained:

> The most common way a state creates such an interest is by adopting regulations which establish "substantive predicates" to govern official decisionmaking and by mandating the outcome to be reached upon a finding that the relevant criteria have been met. There must be particularized standards or criteria to guide the state's decisionmakers, and the criteria must serve to limit discretion. If a decisionmaker can make his decision for any constitutionally permissible reason or for no reason at all, the state has not created a liberty interest.

960 F.2d at 1428-1429 (citations omitted).

The second part of the inquiry asks whether the regulation in question concerns a restraint that imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. Prior to

*Sandin*, prisoners had asserted federal due process claims based on all sorts of prison regulations, such as those pertaining to visitation, lunch trays, books, electrical outlets in cells, prison jobs, etc. *Id.* at 482–83. In *Sandin*, the Court clarified its earlier decisions on state-created liberty interests by making it clear that those interests are protected by the Due Process Clause only when state regulations, relating to freedom from restraints, impose "atypical and significant hardships on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484.

This two-part inquiry is based on my understanding of the state of the law in the aftermath of *Sandin* and is the approach adopted by the Second Circuit. In *Tellier v. Fields*, 280 F.3d 69 (2d Cir. 2001), the Second Circuit described the proper analysis:

> As we have recognized previously, after the Supreme Court's decision in *Sandin*, our determination of "whether the plaintiff had a protected liberty interest in not being confined" also requires a two-part analysis. [*Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997)] (citing *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996) (per curiam)). "As a result of *Sandin*, a prisoner has a liberty interest only if the deprivation . . . is atypical and significant and the state has created the liberty interest by statute or regulation." *Id.* at 52.
>
> First, we examine whether the alleged deprivation was atypical and significant. . . . Second, we must examine whether the state

has created a liberty interest by statute or regulation.

280 F.3d at 80.

> After conducting the *Hewitt* / *Sandin* analysis . . . we conclude that Section 541.22 creates a liberty interest. Under [*Hewitt v. Helms*, 459 U.S. 460 (1983)], courts considering the existence of an alleged liberty interest must ascertain whether "statutes or regulations require, in 'language of an unmistakably mandatory character,' that a prisoner not suffer a particular deprivation absent specified predicates." *Welch v. Bartlett*, 196 F.3d 389, 392 (2d Cir. 1999) (quoting *Hewitt*, 459 U.S. at 471–72).

280 F.3d at 81.

> Read together, *Sandin*, *Wolff*, and *Meachum*, all support the proposition that a statute or regulation which involves "state-created right[s]," [*Wolff v. McDonnell*, 418 U.S. 539, 557 (1974)], creates a protectable liberty interest when an official's failure to adhere to the statute results in an "atypical, significant deprivation," *Sandin*, 515 U.S. at 486, of "real substance," *Wolff*, 418 U.S. at 557, and not simply "ephemeral and insubstantial" violations. *Meachum*, 427 U.S. at 228.

280 F.3d at 83.

Similarly, in *Smith v. Cruse*, the Northern District of California held that *Sandin's* "atypical and significant hardship" due process analysis must be triggered by the existence of a state regulation which significantly limits the discretion of prison officials. No. C 10-3684 SBA (PR), 2012 WL 1155964, at *7 (N.D. Cal. Mar. 30, 2012); *see also Lopez v. Cate*, No. C 11-2644, 2012 WL 4677221 YGA (PR), at *5 (N.D. Cal. Sept. 30, 2012) ("Deprivations that are authorized by state law . . . may also amount to deprivations of a procedurally protected liberty interest, provided that: (1) state statutes or regulations narrowly restrict the power of prison officials to impose the deprivation, i.e., give the inmate a kind of right to avoid it, and (2) the liberty in question is one of 'real substance.'"); *Reed v. Knipp*, No. CIV-S-11-2753 KJN KJN P., 2012 WL 6570906, at *2 (E.D. Cal. Dec. 17, 2012) ("Because this language gives the decisionmaker a certain amount of discretion to deny credit restoration, the statutes and regulations do not create a liberty interest in the restoration of forfeited credits.").

The court cites the opinions of five panels of this court for the proposition that "we have concluded that the discretionary/mandatory substantive predicates approach was 'abandoned' or 'overruled' in *Sandin*, and our decisions have focused only on the 'atypical and significant hardship' test, even in the face of relevant prison regulations." It is true that, in these five cases[1] and a handful of others,[2] panels of this

---

[1] *Myron v. Terhune*, 476 F.3d 716, 719 (9th Cir. 2007) (finding prison regulations governing an inmate's classification did not create a liberty interest because they did not amount to an atypical and significant hardship and noting that *Sandin* rejected the mandatory/discretionary methodology); *McQuillion v. Duncan*, 306 F.3d 895, 903 (9th Cir. 2002) (holding that *Sandin* was not applicable to the parole system at issue, but opining that *Sandin* "abandoned" the mandatory language framework);

court have opined that *Sandin* ended the substantive predicate approach. But none of these cases directly address the issue, and their statements about the continuing validity of the substantive predicate approach are dicta, not binding on this panel or on district courts within the circuit. Instead, these cases simply affirm the uncontroversial proposition that *Sandin* created the requirement of an "atypical and significant hardship" in order to establish a state-created liberty interest.

Turning now to the facts of this case, the parties did not identify any prison regulation that puts a limit on an official's discretion in order to place a prisoner on contraband watch. The parties seem to have agreed, and certainly did not dispute for purposes of summary judgment, that the contraband watch regulations in effect at the relevant time were set forth in

---

*Mitchell v. Dupnik*, 75 F.3d 517, 522 (9th Cir. 1996) (holding a jail policy did not create an "atypical and significant hardship" and so no liberty interest was created, but noting the Supreme Court in *Sandin* criticized the "substantive predicate approach"); *Duffy v. Riveland*, 98 F.3d 447, 457 (9th Cir. 1996) (remanding the case for consideration of whether the deprivation constituted an atypical and significant hardship, but commenting that the substantive predicate test had been "abandoned" by *Sandin*); *Mujahid v. Meyer*, 59 F.3d 931, 932 (9th Cir. 1995) (holding disciplinary segregation did not constitute "atypical and significant" hardship under *Sandin* and thus, no liberty interest was created, but noting that case law employing the "substantive predicate" and "mandatory language" test had been overruled by *Sandin*).

[2] *See, e.g.*, *Neal v. Shimoda*, 131 F.3d 818, 829–30 (9th Cir. 1997) (opining that the substantive predicate test had "likely . . . been disapproved" by *Sandin*, but concluding that, in any event, the classification of prisoners as sex offenders satisfies that test); *Keenan v. Hall*, 83 F.3d 1083, 1088-89 (stating that *Sandin* "rejected its prior [substantive predicate] test" and remanding because the district court had not considered whether the deprivation was atypical and significant).

plaintiff's exhibit J.[3]  These regulations deal mainly with the *conditions* of contraband watch, and do not describe any *limitations* on an official's discretion. The only provisions relating to the decision to place an inmate on contraband watch are found in the first paragraph of page 1 and the second paragraph on page 5 of regulation 52050.25:

> The responsible Facility Captain during business hours, and the AOD during non-business hours, (evenings/Saturdays/Sundays/holidays), are delegated the authority to place inmates suspected of concealing contraband items within their body cavities on Body Cavity Surveillance Status. Notification will be made to the respective Associate Warden during business hours.
>
> . . .
>
> The Watch Commander will only terminate Body Cavity Surveillance with Concurrence of the Facility Captain where the inmate was previously housed or the AOD during non-business hours.  If extenuating circumstances exist, the Body Cavity Surveillance may be continued; however, review of each case will be conducted daily by the affected Facility Program Lieutenant to determine whether

---

[3]  This exhibit was not included in the record of this court and was obtained from the district court docket. According to the district court decision, plaintiff offered this excerpt of the CDC Operations Manual as proof of the conditions and procedures in effect at the time when he was on contraband watch, and the defendants have not objected to its accuracy.

termination or continuation of the Body Cavity Surveillance is necessary.

An inmate may be placed on contraband watch based on mere suspicion of concealing contraband within his body cavities. Such suspicion does not even have to be reasonable. Moreover, it appears from the regulation that it is entirely within the discretion of the affected Facility Program Lieutenant to determine whether termination or continuation of the Body Cavity Search is necessary. This regulation is not a substantive limitation on official discretion and therefore the regulations do not qualify as a state-created liberty interest.

Because subjecting Chappell to contraband watch did not violate the Due Process Clause, and because he failed to show that he had a state-created liberty interest in avoiding contraband watch, his due process claim fails as a matter of law.

---

BERZON, Circuit Judge, dissenting in part:

I join Part III.B of the majority opinion, as I agree that Defendants Mandeville and Rosario are entitled to qualified immunity on the due process issues. In my view, however, the defendants are not entitled to qualified immunity on Chappell's Eighth Amendment claim. As I would affirm the district court's denial of summary judgment on qualified immunity with respect to the Eighth Amendment issue, I respectfully dissent from Part III.A of the majority opinion.

# I

Our jurisdiction over this collateral order appeal of the district court's denial of summary judgment on qualified immunity grounds is limited to questions of law. *See Ortiz v. Jordan*, 131 S. Ct. 884, 891 (2011); *Behrens v. Pelletier*, 516 U.S. 299, 312–13 (1996); *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995); *Alston v. Read*, 663 F.3d 1094, 1098 (9th Cir. 2011). We do not concern ourselves with whether the "pre-trial record sets forth a genuine issue of fact for trial," but instead examine the "purely legal issue whether the facts alleged . . . support a claim of clearly established law." *Alston*, 663 F.3d at 1098 (alteration in original) (internal quotation marks omitted).

On this record, there are disputed issues of fact concerning: (a) the impact of the lighting, in combination with other conditions (e.g., lack of a mattress, waist restraints, etc.), on Chappell's sleep; and (b) the legitimate need for a twenty-four hour bright light in Chappell's cell (as opposed to a dimmed light) for surveillance, given all the other restrictions on his movement. We resolve all factual disputes and draw all reasonable inferences in favor of Chappell, the non-moving party, and "look at the purely legal question of whether the defendant[s'] alleged conduct violated [Chappell's] clearly established constitutional rights." *Cunningham v. City of Wenatchee*, 345 F.3d 802, 807–08 (9th Cir. 2003); *accord Mattos v. Agarano*, 661 F.3d 433, 439–40 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 2681, 2682, 2684 (2012); *Jeffers v. Gomez*, 267 F.3d 895, 903 (9th Cir. 2001).

For purposes of this appeal, the established facts pertaining to Chappell's Eighth Amendment claim are as follows:

From April 30, 2002, until May 6, 2002, Chappell was confined to a surveillance cell containing only a bedframe without a mattress. After being stripped and subjected to a "body cavity search," Chappell was dressed in two pairs of underwear and two jumpsuits, one of each worn facing forward and the other worn backwards. The clothing was taped closed at the thighs, ankles, upper arms, and waist. He was then placed in waist chain restraints and ankle shackles, and was chained to the bedframe. Chappell's handcuffs were attached to the waist chain, forcing him to keep his hands at his sides at all times, even while eating. The lights in the cell were "very bright" and were kept on constantly throughout his nearly seven-day confinement on contraband watch.

While Chappell did not expressly allege that the conditions of contraband watch caused him "grave sleeping problems," as did the prisoner in *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996), the statements in Chappell's amended complaint permit an inference that his sleep was disturbed. Specifically, he describes how he had to "attempt" to sleep on a bare metal cot with bodily restraints, under constant "very bright light," alleging that the conditions "did in fact torture [him] mentally" and that he was "deteriorating mentally."

## II

Whether constant illumination violates the Eighth Amendment in a particular case is a fact-specific inquiry. But contrary to the majority's suggestion, Maj. Op. at 10, officials do not enjoy qualified immunity simply because the precise facts at issue in their particular case have not been addressed previously. Officials can "still be on notice that their conduct violates established law even in novel factual circumstances."

*Hope v. Pelzer*, 536 U.S. 730, 741 (2002). If new facts alone triggered qualified immunity, then officials would rarely if ever be held accountable in cases involving "fact-driven" claims, such as the Eighth Amendment claim at issue here. *Cf. Mattos*, 661 F.3d at 442 (applying the "clearly established" rule to a fact-specific Fourth Amendment case). We therefore must begin with what *was* the clearly established Eighth Amendment law regarding prison conditions at the time of Chappell's contraband watch, and then proceed to determine whether a reasonable prison official could have considered the conditions of Chappell's contraband watch constitutional in light of those precedents.

In April–May 2002, it was clearly established that it is unconstitutional to cause a prisoner harm by subjecting him to constant lighting. *Keenan* pronounced in 1996 that "*[t]here is no* legitimate penological justification for requiring [inmates] to suffer physical and psychological harm by living in constant illumination." 83 F.3d at 1090 (alteration in original) (emphasis added). Thus, contrary to the majority's representation, *Keenan* did not simply hold that the prison officials *in that particular case* lacked a legitimate penological justification for imposing constant illumination, *see* Maj. Op. at 9–11 & n.3; it held that if constant illumination causes a prisoner physical or psychological harm, then no penological purpose can justify it; "[the] practice is unconstitutional." *Keenan*, 83 F.3d at 1090.

Moreover, it was clearly established law that conditions having the mutually reinforcing effect of depriving a prisoner of a single basic need, such as sleep, may violate the Eighth Amendment. *See Wilson v. Seiter*, 501 U.S. 294, 304–05 (1991); *see also Keenan*, 83 F.3d at 1090 ("Adequate lighting is one of the fundamental attributes of adequate shelter

required by the Eighth Amendment.") (internal quotation marks omitted); *Harper v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999) ("[S]leep undoubtedly counts as one of life's basic needs."); *Shepherd v. Ault*, 982 F. Supp. 643, 648 (N. D. Iowa 1997) ("Constant illumination can undoubtedly cause sleep deprivation . . . and sleep is certainly an 'identifiable human need.'").

The cases the majority cites in support of its qualified immunity analysis are not to the contrary. *See* Maj. Op. at 12–13. Instead, those cases held only that constant illumination from dim lights or lights distanced from a prisoner's cell (such as hallway lights) did not amount to cruel and unusual punishment, *see Fillmore v. Ordonez*, 829 F. Supp. 1544, 1552, 1568 (D. Kan. 1993) ("low-intensity," "soft" lighting); *Williams v. Ward*, 567 F. Supp. 10, 13 (E.D.N.Y. 1982) (light in hallway); *Cassidy v. Superintendent*, 392 F. Supp. 330, 334 (W.D. Va. 1975) ("[T]he light is not so bright as to interfere with the inmates' rest."), and that "discomfort of lights at night [does] not constitute a constitutional deprivation" when the prisoner was provided with bedding, not subject to any other bodily restraints in his cell, and not denied sleep, *Bauer v. Sielaff*, 372 F. Supp. 1104, 1110 (E.D. Pa. 1974). Those cases are inapposite here, where the light was "very bright" and inside Chappell's cell, and where the fair inference from the facts on summary judgment, viewed most favorably to the plaintiff, is that the lighting, in combination with the other conditions on contraband watch, interfered with Chappell's sleep.

Similarly, the majority's reliance on *Zatko v. Rowland*, 835 F. Supp. 1174 (N. D. Cal. 1993), is misplaced. *See* Maj. Op. at 12, 13. While the court's observation in *Zatko* that constant illumination of a jail cell with bright light, depriving

the inmate of normal sleep, "would violate his basic right to shelter," is relevant, *id.* at 1181, its ultimate ruling on Zatko's Eighth Amendment claim has little bearing on the law applicable here. Zatko admitted that the officers "tr[ied] to accommodate the inmates [and did not] unnecessarily use the light to keep [him] awake." *Id.* In contrast, Chappell never conceded that the bright light (in combination with other conditions) was not intended to interfere with his sleep, or that the defendants did not exhibit deliberate indifference to its impact on his sleep.

Moreover, that some courts—unlike ours—have recognized that there can be a legitimate penological justification for constant lighting does not mean that *any* asserted penological purpose will justify such illumination. The Eighth Circuit cases cited by the majority, *Ferguson v. Cape Girardeau County*, 88 F.3d 647 (8th Cir. 1996) and *O'Donnell v. Thomas*, 826 F.2d 788 (8th Cir. 1987), *see* Maj. Op. at 13, held that there was a legitimate governmental interest in constant illumination of pretrial inmates' cells *in view of the particular circumstances* of those cases—circumstances distinct enough from those at issue here that a reasonable officer would not have thought that either *Ferguson* or *O'Donnell* condones the actions taken here.

In *Ferguson*, the prisoner's medical condition and safety concerns, in combination with the amount of time he spent outside of the cell, justified constant illumination to enable continuous surveillance of the prisoner while he was in his cell. *See Ferguson*, 88 F.3d at 650. Moreover, Ferguson was observed sleeping "ninety-three hours of the fourteen days spent in the vestibule [cell]." *Id.* Here, the totality of the circumstances, including the conditions restricting Chappell's

movement and foreclosing his ability to conceal anything while on contraband watch, detract from, rather than enhance, the need for the constant, twenty-four-hour bright light: Chappell was not allowed out of the cell; had no mattress, water, or toilet; was dressed in highly restrictive clothing; and was placed in waist restraints and shackles.

Nor would *O'Donnell* lead a reasonable officer to believe that the conditions of Chappell's confinement on contraband watch were constitutional. The constant illumination of O'Donnell's cell was held "not unreasonable" in view of the inmate's previous suicide attempt, escape concerns, and fear that he would be a danger to himself or others. *O'Donnell*, 826 F.2d at 790. Comparable concerns were not present in Chappell's case. Moreover, there was no indication that, in addition to the lighting, O'Donnell was simultaneously subject to physical restraints in his holding cell, like those imposed on Chappell, decreasing the need for illumination as a safety precaution.

A reasonable officer would have known that, in combination, the twenty-four-hour bright light, the absence of a mattress, and the extensive bodily restraints risked depriving Chappell of sleep, in violation of the Eighth Amendment. The district court correctly denied summary judgment on this claim on qualified immunity grounds, affording Chappell an opportunity to prove that Mandeville and Rosario demonstrated deliberate indifference to the risk of physical or psychological harm created by the conditions of confinement on contraband watch. For these reasons, I respectfully dissent from Part III.A of the majority opinion.