**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MATTHEW ALEXANDER TARABOCHIA; ALEX DANIEL TARABOCHIA, *Plaintiffs-Appellants*, | No. 11-35837 |
| | D.C. No. 3:10-cv-05197-BHS |
| v. | |
| FBI SPECIAL AGENT MICKEY ADKINS, *Defendant*, | OPINION |
| and | |
| SERGEANT DAN CHADWICK, Washington Department of Fish and Wildlife; OFFICER BRETT HOPKINS, Washington Department of Fish and Wildlife; SERGEANT BRAD RHODEN, Washington Department of Fish and Wildlife; MIKE CENCI, Capt./Director of Law Enforcement of the Washington Department of Fish and Wildlife, *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Western District of Washington
Benjamin H. Settle, District Judge, Presiding

Argued and Submitted
April 7, 2014—Seattle, Washington

Filed September 9, 2014

Before: Michael Daly Hawkins, Johnnie B. Rawlinson,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge Hawkins

**SUMMARY**[*]

**Civil Rights**

The panel reversed in part and affirmed in part the district court's summary judgment and remanded in an action brought by four commercial fishers who alleged that officers from the Washington Department of Fish and Wildlife illegally stopped and searched their automobile on March 23, 2007, and harassed them throughout the years because of a personal vendetta.

The panel held that it was clearly established on the date of the automobile stop that plaintiffs had a Fourth Amendment right not to be stopped by Fish and Wildlife officers while driving on a highway absent reasonable suspicion they had engaged or were about to engage in unlawful activity. The panel held that the stop, which lacked any basis in suspicion of unlawful behavior or statutory

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

authority that would render it permissible under the administrative search exception, violated plaintiffs' clearly established Fourth Amendment rights. The panel therefore held that officers Michael Cenci and Dan Chadwick were not entitled to qualified immunity on plaintiffs' Fourth Amendment claim.

The panel affirmed the dismissal of plaintiffs' Fourteenth Amendment substantive due process claim on the grounds that the district court correctly deemed this claim untimely.

**COUNSEL**

Amit Kurlekar (argued), Kaufhold Gaskin LLP, San Francisco, California, Pro Bono Counsel for Plaintiffs-Appellants.

Paul F. James (argued), Assistant Attorney General and Robert W. Ferguson, Attorney General, Office of the Washington Attorney General, Olympia, Washington, for Defendants-Appellees.

**OPINION**

HAWKINS, Circuit Judge:

We must decide whether a suspicionless roving automobile stop of commercial fishers made while they drive on a public highway to investigate compliance with Washington fish and game laws constitutes an unreasonable search and seizure within the meaning of the Fourth Amendment and, if so, whether this right was clearly

established as of the time of the stop at issue in this case. Because we determine that this stop, which lacked any basis in suspicion of unlawful behavior or statutory authority that would render it permissible under the administrative search exception, violated Appellants' clearly established Fourth Amendment rights, we reverse the district court's grant of qualified immunity on Appellants' Fourth Amendment claim and remand.  We affirm the dismissal of Appellants' Fourteenth Amendment substantive due process claim because the district court correctly deemed this claim untimely.

## I.  BACKGROUND

The facts underlying this case stretch back to the year 2000 and culminate in an automobile stop on March 23, 2007. Appellants Matthew and Alex Tarabochia,[1] along with their brother, Bryan, are the sons of Joseph Tarabochia,[2] a longtime commercial fisher.  The Tarabochias allege that beginning sometime in 2000, Captain Michael Cenci and other Washington Department of Fish and Wildlife ("WDFW") officers began a "personal vendetta" against them.  The WDFW officers insist they were engaged in proper law enforcement activities against fishing scofflaws. The district court was able to resolve these facts in the officers' favor.  We are not.

---

[1] Due to their failure to list all four original plaintiffs on the Notice of Appeal, Matthew and Alex are the only Appellants in this case.  *See Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 317–18 (1988) (use of "et al." does not confer jurisdiction over appeal of plaintiff not listed in notice of appeal).

[2] We refer to the Tarabochias by their first names throughout this opinion for clarity.

Taking the facts, as we must, in the light most favorable to the nonmoving party, *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1090 (9th Cir. 2013), from 2000 until the date of the stop at issue, Captain Cenci and other WDFW officers have, among other things: followed the Tarabochias in their automobile on multiple occasions; detained Joseph and Matthew, including Joseph on one occasion for an hour and a half only to let him leave without citation; confronted the Tarabochias aboard their fishing vessel with a knife in hand and accompanied by at least six other WDFW officers; intentionally swerved into their automobile while both cars were driving on a public road; followed Alex and Bryan to school on an almost daily basis; verbally threatened to "get" Joseph and Alex on unspecified charges; and charged the Tarabochias with at least twenty-seven "criminal counts, in at least [eleven] court cases, in four [different] jurisdictions," many of which charges were dismissed prior to trial, none resulting in conviction. After a March 2006 incident, which resulted in charges that were later dropped, WDFW officers started spreading unfounded rumors that Joseph posed a risk to officer safety.

Given this history, the Tarabochias became fearful of WDFW officers, and in 2006 Joseph requested a meeting with the local prosecutor and the director of the WDFW to address the family's concerns. According to the prosecutor, when Captain Cenci and another WDFW officer arrived at the meeting, Cenci immediately tried to frisk Joseph despite what the prosecutor considered a lack of any evidence that he posed a threat. Finding Cenci's behavior "outrageous," the prosecutor prevented Cenci from carrying out the frisk, and the officers left the meeting.

On the morning of March 23, 2007, the Tarabochias were driving in their pickup truck, which was loaded with a tote containing recently caught salmon, along a state highway and a public road when WDFW Sergeant Dan Chadwick and Captain Cenci stopped them.[3]  Approximately a half an hour beforehand, Captain Cenci had observed the Tarabochias from afar while he conducted a field inspection in an area of the lower Columbia River where commercial fishers regularly tie up their boats and unload recently caught fish.  A portion of this area is near the Tarabochias' home.

Sometime that morning, a newspaper reporter accompanying Captain Cenci as a ride along passenger notified Cenci that he had observed the Tarabochias load salmon into the tote on the back of their pickup truck.  Cenci called Sergeant Chadwick, who was also in the general area and relayed this information.  Although the officers suspected the Tarabochias had salmon on their truck, it is undisputed that they had no reason to believe these salmon had been taken in violation of applicable fish and game laws.

The officers decided not to inspect the fish at the dock, but instead decided to pull the Tarabochias' truck over once on the highway[4] to check for compliance with fish and game laws.  All four Tarabochias left the area of the field inspection in their pickup truck loaded with the tote of salmon.  Sergeant

---

[3] The facts indicate that the WDFW officers began to follow the Tarabochias on the highway and then followed them onto a public road. Because we find this distinction irrelevant to our constitutional inquiry, we refer to the place of the stop and search as a "highway."

[4] The officers assert they did so because of safety concerns based on an earlier encounter Captain Cenci had with Joseph two days beforehand.

Chadwick, who had been parked along a state highway, saw the truck pass by him. At that time, he began to follow the Tarabochias and, after the Tarabochias had exited off the highway onto a public road, he activated his emergency lights to effectuate the stop. The Tarabochias initially failed to stop, but Captain Cenci, who had been following behind Sergeant Chadwick, pulled his automobile in front of the Tarabochias, and caused them to stop. Officers Brett Hopkins and Brad Rhoden soon arrived on the scene to lend assistance.[5]

The Tarabochias refused to exit the automobile or open the doors until sheriff's deputies arrived because of their past experience with the WDFW officers. Once someone the Tarabochias recognized as a member of the Wahkiakum County Sheriff's Office arrived (about twelve minutes later), the Tarabochias opened the car doors, and the WDFW officers arrested Matthew and Joseph. The officers proceeded to inspect the salmon in the tote, which inspection failed to reveal any fish and game violations.

Joseph and Matthew were booked, cited for, among other things, "avoiding a wildlife field inspection," and released. A Washington state district court for the County of Wahkiakum later dismissed all charges, finding the stop, search, and arrests unlawful since the officers had acted contrary to state law and to the Washington state constitution

---

[5] Because the complaint does not allege and the record does not indicate that Officers Hopkins or Rhoden took part in the decision to stop and search the Tarabochias' automobile or that they participated in the alleged "vendetta," even construing the facts in the light most favorable to the Tarabochias, there is insufficient basis to hold either of them liable under 42 U.S.C. § 1983. The district court is therefore instructed to dismiss the complaint against them with prejudice.

in stopping and searching the Tarabochias' automobile. On appeal, the superior court upheld this decision, although without reaching the constitutional issue, and reaffirmed that at the time Captain Cenci ordered the stop of the Tarabochias' automobile, he did not have "any reason to believe" the Tarabochias' truck contained "evidence of a violation of law or rules[.]"

The Tarabochias filed their pro se federal district court complaint pursuant to 42 U.S.C. § 1983 in March 2010, alleging that WDFW officers Dan Chadwick, Brett Hopkins, Brad Rhoden, and Mike Cenci violated their Fourth and Fourteenth Amendment rights by stopping and searching their automobile on March 23, 2007, and harassing them throughout the years.[6] The district court initially granted summary judgment to the officers on the Tarabochias' Fourth Amendment claim, but denied them summary judgment on the Tarabochias' Fourteenth Amendment substantive due process claim. Relying on a California state court decision, the district court held that qualified immunity precluded the Tarabochias' Fourth Amendment search and seizure claim since "the law regarding warrantless stops by WDFW officers was not clearly established" at the time of the stop.

In September 2011, the court granted the Defendants' second motion for summary judgment and dismissed the case, holding that the § 1983 statute of limitations barred the Tarabochias' Fourteenth Amendment substantive due process claim. This appeal followed.

---

[6] The Tarabochias also alleged a Sixth Amendment claim and a Fourteenth Amendment equal protection claim, which have since been dismissed and are not advanced on appeal.

## II. STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment based on qualified immunity and statute of limitations grounds. *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1045 (9th Cir. 2012) (statute of limitations); *Davis v. City of Las Vegas*, 478 F.3d 1048, 1053 (9th Cir. 2007) (qualified immunity). "In determining whether genuine issues of material fact remain, we are required to view all evidence and draw all inferences in the light most favorable to the nonmoving party, here, the" Tarabochias. *Gravelet-Blondin*, 728 F.3d at 1090 (internal quotation marks omitted).

## III. DISCUSSION

### A. Fourth Amendment Claim

We begin with the grant of summary judgment to Defendants on the Tarabochias' Fourth Amendment search and seizure claim based on qualified immunity. "Qualified immunity protects government officials from civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Chappell v. Mandeville*, 706 F.3d 1052, 1056 (9th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This doctrine provides an immunity from suit rather than a defense to liability, *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), and ensures that "officers are on notice their conduct is unlawful" before being subjected to suit. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). In this way, the doctrine strikes a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from

harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231.

In determining whether officers are entitled to qualified immunity, we consider (1) whether "the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established" as of the date of the involved events "in light of the specific context of the case." *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009). We exercise our discretion to consider the constitutional violation prong first. *See Pearson*, 555 U.S. at 236.

### 1. Constitutional Violation

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. Given the Fourth Amendment's core purpose of protecting against arbitrary intrusions by government officials, *see Delaware v. Prouse*, 440 U.S. 648, 653–54 (1979), "[a] search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *United States v. Fraire*, 575 F.3d 929, 931 (9th Cir. 2009) (citing *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000)). Because stopping an automobile and detaining its occupants, "even if only for a brief period and for a limited purpose," constitutes a "seizure" under the Fourth Amendment, *Whren v. United States*, 517 U.S. 806, 809–10 (1996), an official must have individualized "reasonable suspicion" of unlawful conduct to carry out such a stop. *See Prouse*, 440 U.S. at 663; *United States v. Brignoni-Ponce*, 422 U.S. 873, 884–86 (1975).

Defendants argue that these Fourth Amendment principles are not applicable to the automobile stop and search in this case because of the Tarabochias' status as commercial fishers. Because administrative inspections of private property, such as the one purportedly carried out by Defendants here, constitute "searches" under the Fourth Amendment, *Donovan v. Dewey*, 452 U.S. 594, 598 (1981), if they are "unaccompanied by any quantum of individualized, articulable suspicion" they "must be undertaken pursuant to previously specified 'neutral criteria,'" i.e., a warrant. *Prouse*, 440 U.S. at 662 (quoting *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 323 (1978)). However, a warrant is not required if the search falls within "certain carefully defined classes of cases." *Camara v. Mun. Court of City & Cnty. of S.F.*, 387 U.S. 523, 528 (1967).

The WDFW officers argue that the stop and search here falls within one of these classes of cases, namely, administrative searches of enterprises engaged in pervasively regulated industries. Because the Tarabochias are commercial fishers who had salmon aboard their moving truck, Defendants argue, they could be stopped by officers on a highway to inspect their documents and demand they display their catch, even absent any suspicion of unlawful behavior. The officers argue they needed only "knowledge" that the Tarabochias had recently engaged in fishing to justify the stop under the Fourth Amendment.[7]

---

[7] Defendants do not argue that they stopped the Tarabochias as part of a fixed checkpoint. Their reliance on checkpoint cases for the proposition that individualized suspicion of wrongdoing is unnecessary is therefore misplaced given the distinct nature of checkpoints as opposed to the type of roving stop at issue here. *See Fraire*, 575 F.3d at 934–35 (holding a checkpoint stop reasonable under the Fourth Amendment and explaining that "[t]he subjective intrusion from a checkpoint stop is significantly less

The administrative search exception is applicable to warrantless searches where the search promotes an important governmental interest, is authorized by statute, and the authorizing statute and its regulatory scheme provide specific limitations on the manner and place of the search so as to limit the possibility of abuse. *See United States v. Raub*, 637 F.2d 1205, 1209–11 (9th Cir. 1980) (search of fishing vessel held to be within the administrative search exception). Where an inspection is authorized by statute but there are "no rules governing the procedure that inspectors must follow, the Fourth Amendment and its various restrictive rules apply." *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 77 (1970).

An industry's long history of regulation is also relevant to this inquiry insofar as it limits an individual's reasonable expectation of privacy in things or places traditionally subject to search under the industry's regulatory scheme. *See Donovan*, 452 U.S. at 605–06; *Raub*, 637 F.2d at 1210. It therefore comes as no surprise that the cases in which this exception has been applied involve warrantless searches conducted on the premises or within the milieu of the regulated business or industry. *See, e.g.*, *Donovan*, 452 U.S. 594 (mines and stone quarries); *United States v. Biswell*, 406 U.S. 311 (1972) (gun retail establishments); *Colonnade Catering Corp.*, 397 U.S. 72 (liquor retail establishments); *United States v. Kaiyo Maru No. 53*, 699 F.2d 989 (9th Cir.

---

than other types of seizures, such as random stops"). Additionally, although Defendants allege they stopped the Tarabochias on the highway because stopping them in the field inspection area near their home presented unidentified safety concerns, they do not attempt to justify constitutionally the stop on the basis of this disputed fact. We therefore do not address this argument.

1983) (fishing vessels); *Raub*, 637 F.2d 1205 (fishing vessels); *United States v. Tsuda Maru*, 470 F. Supp. 1223 (D. Alaska 1979) (fishing vessels).

To justify the stop under this exception, the officers rely on the state's broad interest in protecting the fishery, the long history of regulation of the commercial fishing industry, and two Washington state statutory provisions. To be sure, protecting the fishery is an important governmental interest and "[c]ommercial fishing has a long history of being a closely regulated industry." *Raub*, 637 F.2d at 1209. But a specific statute authorizing a particular type of warrantless search is required, and the existence of such a statute alone may not even be sufficient, for the administrative search exception to apply. *See Kaiyo Maru No. 53*, 699 F.2d at 995 (noting that the "reasonableness" of a warrantless inspection program under the Fourth Amendment "is determined on a case-by-case basis" and "depends on the specific enforcement needs and privacy guarantees of each statute"); *Raub*, 637 F.2d at 1211 n.7 (explicitly limiting its holding to searches under the Sockeye Salmon or Pink Salmon Fishing Act); *Tsuda Maru*, 470 F. Supp. at 1227–30 (upholding search under the Fishery Conservation Management Act).

The officers rely on two statutory provisions within Washington's Fish and Wildlife Enforcement Code as providing authority for the stop and search at issue. The first statute provides that, "[b]ased upon articulable facts that a person is engaged in fishing . . . fish and wildlife officers have the authority to temporarily stop the person and check for valid licenses, tags, permits, stamps, or catch record cards, and to inspect all fish . . . and wildlife in possession as well as the equipment being used to ensure compliance with . . . this title." Wash. Rev. Code § 77.15.080(1) (2002). This

statute does not expressly authorize an *automobile* stop or define "engaged in fishing," and Defendants have pointed to no regulatory or other published authority applying this provision to a roving automobile stop of commercial fishers.

Assuming, *arguendo*, that one could be "engaged in fishing" while driving on a highway with salmon, given the statute's lack of definition and failure explicitly to authorize the stop and search of an automobile, a commercial fisher is unlikely to be aware that this provision could subject him or her to a stop and search while engaging in this conduct. This factor weighs against finding that section 77.15.080(1) meets the demands of the administrative search exception, much less that it authorizes this type of stop in the first place. *See Donovan*, 452 U.S. at 603 (upholding a warrantless search under the administrative search exception in part because, in addition to being "specifically tailored" to protect the government's interests, the regulations the Federal Mine Safety and Health Act of 1977 imposed were "sufficiently pervasive and defined that the owner of such a [mine] cannot help but be aware that he will be subject to effective inspection") (internal quotation marks omitted).

Furthermore, unlike in *Kaiyo Maru No. 53*, 699 F.2d at 994–97, or *Raub*, 637 F.2d at 1210, where the relevant statutes and regulations carefully limited warrantless searches to certain areas within fishing vessels found in specific waters and to individuals either actively engaged in fish harvesting or in suspicious activities, there is nothing in section 77.15.080(1) limiting the potential scope of automobile searches conducted under its authority. Without these limitations, section 77.15.080(1) could potentially authorize inspection of any automobile possibly containing fish or wildlife at any time, whether in motion or stationary, and in

any location, even if hundreds of miles from the closest fishing grounds or commercial fishing establishment, so long as an officer believed the person was then "engaged in fishing." The statute's lack of specificity is further evidenced by its application to all "persons," not simply to commercial fishers. *See State v. Thorp*, 856 P.2d 1123, 1126 (Wash. Ct. App. 1993) (holding administrative search exception inapplicable to a roving automobile stop where the relevant statute applied to "any person," indicating regulation of the general public, not a particular industry). Therefore, we find unpersuasive Defendants' argument that this statute authorized the stop and search of the Tarabochias' automobile and did so in a manner consistent with the administrative search exception.

The only other statute the officers point to provides that "[f]ish and wildlife officers may inspect without warrant at reasonable times and in a reasonable manner the premises, containers, fishing equipment, fish, seaweed, shellfish, and wildlife, and records required by the department of any commercial fisher[.]" Wash. Rev. Code § 77.15.096 (2002). This provision goes on to prohibit officers from conducting warrantless searches and seizures where "the thing or place is protected from search without warrant within the meaning of Article I, section 7 of the state Constitution." As with section 77.15.080(1), this statute says nothing of stopping or searching commercial fishers' automobiles and Defendants have provided no authority interpreting this provision as authorizing such a stop.

Even if section 77.15.096 could somehow be construed to authorize the suspicionless stop and subsequent search of a

closed tote aboard a commercial fisher's automobile,[8] the portion of this provision relied upon by Defendants would still fail to meet the requirements of the administrative search exception since it "does not provide any standards to guide inspectors either in their selection of [automobiles] to be searched or in the exercise of their authority to search." *Donovan*, 452 U.S. at 601; *accord Colonnade Catering Corp.*, 397 U.S. at 77. Instead, the only limitation this portion of section 77.15.096 would place on stops and inspections of commercial fishers in moving automobiles would be that such stops be carried out "at reasonable times and in a reasonable manner." The Fourth Amendment already requires that searches be "reasonable," and the Supreme Court has made clear that additional guidance to cabin officers' discretion to search is required under the administrative search exception. *See Donovan*, 452 U.S. at 601 (discussing *Marshall*, 436 U.S. 307, where the Court held a statutory scheme authorizing warrantless searches "at . . . reasonable times, and within reasonable limits and in a reasonable manner" inadequate under the administrative search exception).

Whether considered in combination or in isolation, these two statutes fail to bring this stop and search within the

---

[8] By section 77.15.096's express language, this would require that Article I, section 7 of the Washington Constitution does not prohibit a warrantless search of a container aboard an automobile stopped absent any suspicion of wrongdoing. This state constitutional provision is more protective than the Fourth Amendment and prohibits automobile stops not founded on probable cause or articulable suspicion of wrongdoing. *City of Seattle v. Mesiani*, 755 P.2d 775, 776 (Wash. 1988) (en banc) (holding sobriety checkpoint violated Washington Constitution and commenting that "article 1, section 7 provides greater protection to individual privacy interests than the Fourth Amendment").

"carefully defined class[ ]" of administrative search cases, *Camara*, 387 U.S. at 528, let alone expressly authorize the stop and search of a moving automobile.

Instead of inspecting the Tarabochias' catch and commercial fishing records in the field, at a commercial fishing establishment, or through a fish and wildlife checkpoint—all of which, both parties agree, would have been authorized under Washington law—the WDFW officers decided to stop the Tarabochias as they traveled in their pickup truck on a highway. They effectuated this stop despite admittedly lacking any suspicion of unlawful behavior or statutory authority that would permit this search under the administrative search exception. We hold that, under these circumstances, this stop, and the search that followed, constituted a Fourth Amendment violation.

## 2. Clearly Established

Although this suspicionless stop and search violated the Fourth Amendment, the WDFW officers are still entitled to qualified immunity on this claim if the Tarabochias' rights were not clearly established as of March 23, 2007, the date of the stop. *Pearson*, 555 U.S. at 231–32. "The plaintiff bears the burden of proof that the right allegedly violated was clearly established[.]" *Romero v. Kitsap Cnty.*, 931 F.2d 624, 627 (9th Cir. 1991). For a right to be "clearly established," its "contours must be sufficiently clear that a reasonable official would understand that" his or her actions violated that right. *Hope*, 536 U.S. at 739 (internal quotation marks omitted). To meet this standard "the very action in question" need not have "previously been held unlawful." *Chappell*, 706 F.3d at 1056 (internal quotation marks omitted). This is particularly true in the Fourth Amendment context, where the

constitutional standard of "reasonableness" demands a fact-specific inquiry. *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011). Under this second prong, we therefore consider "whether a reasonable officer would have had fair notice that [the action] was unlawful[.]" *Chappell*, 706 F.3d at 1056–57 (internal quotation marks omitted); *accord A.D. v. Calif. Highway Patrol*, 712 F.3d 446, 454 (9th Cir. 2013).

We begin our inquiry "by looking to binding precedent[;] [i]f the right is clearly established by decisional authority of the Supreme Court or this Circuit, our inquiry should come to an end." *Boyd v. Benton Cnty.*, 374 F.3d 773, 781 (9th Cir. 2004) (internal citations omitted). In the absence of binding precedent clearly establishing the constitutional right, "we look to whatever decisional law is available . . . including decisions of state courts, other circuits, and district courts." *Id.* (internal quotation marks omitted).

It was clearly established on the date of the automobile stop at issue here that the Tarabochias had a Fourth Amendment right not to be stopped by WDFW officers while driving on a highway absent reasonable suspicion the Tarabochias had or were about to engage in unlawful activity. In *United States v. Munoz*, 701 F.2d 1293 (9th Cir. 1983), we held that a roving automobile stop by an Oregon Department of Fish and Wildlife biologist and a state game trooper of a hunter driving in a national park to check for compliance with woodcutting and hunting regulations violated the Fourth Amendment because "[s]uch investigative stops must be based on individualized suspicion." *Id.* at 1295–1301.

As here, the officers in *Munoz* stopped the plaintiff to check for compliance with applicable game regulations and they attempted to justify the stop under the Fourth

Amendment's administrative search exception. *Id.* at 1295, 1298–1300. In rejecting this justification, we noted that "[t]he Supreme Court twice has rejected suggestions that th[e] implicit consent theory [underlying the administrative search exception] justifies roving stops of motorists." *Id.* at 1299.

In holding the stop of Munoz unconstitutional, we explicitly relied on these two prior Supreme Court cases—*Prouse*, 440 U.S. at 663, and *Brignoni-Ponce*, 422 U.S. at 884—where the Court held that to conduct a roving automobile stop, officials must reasonably suspect the automobile's occupants of *unlawful* behavior. *Munoz*, 701 F.2d at 1296–1300. Although the purpose of the stops in each of these cases varied, we found the stops at issue in *Prouse* and *Brignoni-Ponce* "indistinguishable" from the stop of Munoz "to check for possible game violations." *Id.* at 1300. Therefore, as in *Prouse* and *Brignoni-Ponce*, the suspicionless stop's intrusion on individual privacy outweighed the government's interest, there, in preserving animal and plant resources. *Id.* at 1297–1301.

*Prouse*, *Brignoni-Ponce*, and *Munoz* clearly established that knowledge that a automobile's occupants are simply engaged in—or, have recently been engaged in—a regulated activity is insufficient on its own to justify an investigatory automobile stop. *See Prouse*, 440 U.S. at 663 ("[E]xcept in those situations in which there is at least . . . reasonable suspicion that a motorist is unlicensed . . . or that either the automobile or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver . . . are unreasonable under the Fourth Amendment."). These cases are supported by a plethora of other pre-March 2007 decisions, which provided the WDFW officers with "fair notice that [their action] was unlawful[.]" *Chappell*, 706

F.3d at 1056–57; *see, e.g.*, *United States v. Rowland*, 464 F.3d 899, 907 (9th Cir. 2006) ("An officer may stop and question an individual suspected of wrongdoing if the officer can point to 'specific and articulable facts which . . . reasonably warrant that intrusion.'") (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)); *United States v. Lopez-Soto*, 205 F.3d 1101, 1104–05 (9th Cir. 2000) (explaining that reasonable suspicion of unlawful behavior is required for traffic stops); *United States v. Twilley*, 222 F.3d 1092, 1095 (9th Cir. 2000) ("Under the Fourth Amendment, government officials may conduct an investigatory stop of a vehicle only if they possess reasonable suspicion . . . of criminal activity.") (internal quotation marks omitted). *Munoz*, 701 F.2d 1293, clearly extended these Fourth Amendment principles to the acts of fish and wildlife officials when acting pursuant to fish and game laws and regulations.[9]

Despite this long line of cases holding that officers must possess reasonable suspicion of unlawful conduct to stop an automobile and detain its occupants, Defendants argue that this right was not clearly established because in *Munoz*, the officers "had no reason to believe" Munoz "had engaged in any regulated activity" before stopping him whereas, here, the officers knew the Tarabochias had recently engaged in fishing. For this assertion, Defendants point out that the officers in *Munoz* did not observe the chopped wood in the back of Munoz's truck before flagging him down to stop;

---

[9] The district court and the WDFW officers relied on *People v. Maikhio*, 253 P.3d 247 (Cal. 2011), a 2011 Supreme Court of California decision, as persuasive authority in holding that the right was not clearly established. Not only is *Maikhio* distinguishable on its facts and largely in conflict with *Munoz*, but it also post-dates the stop at issue here. It is therefore irrelevant to the inquiry of whether the right at issue was clearly established as of the date of the stop.

instead, they noticed the wood "[a]t the same time [they] flagged" him down. *Munoz*, 701 F.2d at 1295.

That the officers in *Munoz* did not see the chopped wood in Munoz's truck before waving him down to stop was not essential to our holding. Instead, as discussed above, we relied on *Prouse*, 440 U.S. 648, and *Brignoni-Ponce*, 422 U.S. 873, for the proposition that "roving stops made without any reasonable suspicion of *criminal* activity regarding the vehicle, its occupants, or its contents" are unconstitutional. *Munoz*, 701 F.2d at 1297 (emphasis added). Under this reasoning, since "[c]arrying wood was not illegal in the park," *id.* at 1296 n.7, the officers' conduct would have still been unconstitutional even if they had observed the chopped wood before effectuating the stop. It was the lack of reasonable suspicion of criminal or other unlawful activity, not of regulated activity, that *Munoz* held essential. Therefore, any slight factual distinction between the stop at issue in *Munoz* and the stop at issue here is "irrelevant . . . because the constitutional rule [*Munoz* and other binding precedent] established appl[ies] with obvious clarity" to the WDFW officers' conduct. *A.D.*, 712 F.3d at 454 (internal quotation marks and citation omitted).[10]

---

[10] Although we need not look beyond binding precedent, *Boyd*, 374 F.3d at 781, we note that even non-binding precedent clearly established the Tarabochias' Fourth Amendment right to be free from the suspicionless stop. In *Thorp*, 856 P.2d 1123, an officer "observed a flatbed truck loaded with cedar blocks traveling north on a county road," and he stopped the truck "in order to ascertain whether its driver . . . had a specialized forest products permit." *Id.* at 1124. As in the Tarabochias' case, the officer's knowledge that Thorp had engaged in a regulated activity—evidenced by the visible cedar blocks in his truck—motivated the stop. *Id.* The officer lacked any "articulable suspicion" before stopping Thorp, and the officer contended that he had authority to conduct the suspicionless stop because

Finally, "a reasonable officer would [have] recognize[d]" that the suspicionless stop of the Tarabochias' automobile exceeded the bounds of the statutes Defendants purportedly relied on. *Grossman v. City of Portland*, 33 F.3d 1200, 1210 (9th Cir. 1994). As discussed above, *supra* Part III.A.1, neither section 77.15.080(1) nor section 77.15.096 mentions stopping or searching automobiles.[11] Unlike these provisions, there are other provisions also within Washington's Fish and Wildlife Enforcement Code that explicitly apply to stops and searches of *automobiles* and, importantly, these statutes carefully limit WDFW officers' authority to conduct such stops and searches.

For example, section 77.15.094 explicitly authorizes WDFW officers to search "vehicles" without a warrant, but

---

the forest products industry is "pervasively regulated." *Id.* at 1124–25. The court rejected this argument and determined that "even if the forest products industry were pervasively regulated, the Fourth Amendment standards applicable to such industries would not allow the police to randomly stop a moving vehicle without . . . articulable suspicion." *Id.* at 1125. Relying explicitly on *Prouse*, 440 U.S. 648, *Brignoni-Ponce*, 422 U.S. 873, and *Munoz*, 701 F.2d 1293, the court held that the stop was "governed by the Fourth Amendment principles that ordinarily apply to traffic stops" and that it was therefore unconstitutional under both the United States and Washington Constitutions. *Id.* at 1126–27. *Thorp*'s facts and constitutional holding are directly applicable to the WDFW officers' conduct.

[11] Defendants argue that *Schlegel v. Department of Licensing*, 153 P.3d 244 (Wash. Ct. App. 2007), a pre-March 2007 decision, renders the stop at issue here lawful under section 77.15.080(1). Although *Schlegel* held that section 77.15.080(1) authorized a stop by a WDFW officer of a hunter's automobile on a "hunting road," it did so within the context of a checkpoint limited to stops of persons "engaged in hunting" while in their automobile and explicitly limited its holding to this factual scenario. *Id.* at 245–47. *Schlegel* therefore does not alter our analysis.

only where officers have "reason to believe" the vehicle contains "evidence of a violation of" fish and game laws or regulations. Wash. Rev. Code § 77.15.094 (2001). The WDFW officers admit they lacked any "reason to believe" the salmon aboard the Tarabochias' truck was "evidence of a violation." WDFW officers also have authority "to require . . . fishers occupying a motor vehicle approaching or entering a check station to stop and produce for inspection . . . [a]ny wildlife, fish, shellfish, or seaweed in their possession," and "licenses, permits, tags, stamps, or catch record cards[.]" Wash. Rev. Code § 77.12.620. These "check station[s]" must be clearly marked, *id.*, and cannot be established "upon interstate highways or state routes." Wash. Rev. Code § 77.15.470(3) (2000).

Thus, "it should have been readily apparent to a reasonable officer" that neither section 77.15.080(1) nor section 77.15.096 authorized the suspicionless roving stop, and the subsequent search, of the Tarabochias' pickup truck as they drove on a highway and public road. *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780, 798 (9th Cir. 2008)); *accord Grossman*, 33 F.3d at 1210 (An officer who enforces an ordinance "in a manner which a reasonable officer would recognize exceeds the bounds of the ordinance, will not be entitled to [qualified] immunity[.]").

For these reasons, we hold that the suspicionless stop and search of the Tarabochias' automobile violated "clearly established . . . constitutional rights of which a reasonable person would have known." *Chappell*, 706 F.3d at 1056. Officers Michael Cenci and Dan Chadwick are therefore not entitled to qualified immunity on the Tarabochias' Fourth Amendment claim.

## B. Fourteenth Amendment Claim

We now turn to the summary judgment dismissal of the Tarabochias' Fourteenth Amendment substantive due process claim. The district court dismissed this claim based on its assumption that the March 23, 2007, stop must be analyzed exclusively under the Fourth Amendment and, absent this incident, all remaining alleged incidents fall outside the applicable statute of limitations.[12] Although the district court did not expressly analyze whether the March 23, 2007, stop could arise under both the Fourteenth and Fourth Amendments, we agree with its ultimate conclusion that it cannot.[13]

---

[12] Contrary to Defendants' suggestion, this argument is not waived due to the Tarabochias' failure to respond to their summary judgment motion as "even if a party fails to raise an issue in the district court, we generally will not deem the issue waived if the district court actually considered it." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1054 (9th Cir. 2006) (citing *Harrell v. 20th Century Ins. Co.*, 934 F.2d 203, 205 n.1 (9th Cir. 1991). The district court actually considered whether the March 23, 2007, incident could form a basis for the Fourteenth Amendment claim. Therefore, we will not deem this issue waived.

[13] On appeal, the Tarabochias argue for the first time that the continuing violations doctrine renders the incidents occurring prior to the limitations period, in conjunction with the March 23, 2007, stop, actionable under the Fourteenth Amendment. Unlike whether the Tarabochias' alleged the March 23, 2007, stop as a factual basis for the Fourteenth Amendment claim, the record does not indicate that the district court ever "actually considered," *Cmty. House, Inc.*, 490 F.3d at 1054, the applicability of the continuing violations doctrine to the remaining incidents when faced with Defendants' summary judgment motions. As a result, this argument is waived. *Alexopulos by Alexopulos v. Riles*, 784 F.2d 1408, 1411 (9th Cir. 1986) (statute of limitation tolling argument waived on appeal because Appellants had not raised it before the district court). Even if we were to consider this argument, we find the continuing violations doctrine

The Supreme Court has instructed that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)) (plurality opinion of Rehnquist, C.J.) (internal quotation marks omitted). The Fourth Amendment explicitly protects against unreasonable "searches and seizures" whereas the Fourteenth Amendment due process clause protects against official behavior that "shocks the conscience." *Fontana v. Haskin*, 262 F.3d 871, 881 (9th Cir. 2001). Because the actionable incident here, the March 23, 2007, stop, "constitutes a 'seizure' of 'persons'" under the Fourth Amendment, *Whren*, 517 U.S. at 809, it is properly analyzed exclusively under this constitutional provision and not under the broader concept of substantive due process. *Compare Fontana*, 262 F.3d at 880–82 (holding that, although "[s]exual misconduct by a police officer" is often analyzed under the Fourteenth Amendment, appellant's claim is properly brought exclusively under the Fourth Amendment since she had been "seized" by the police), *with Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 836, 843 (1998) (holding that a claim stemming from a high-speed police

---

inapplicable since the Tarabochias' claims are based on "discrete acts, each of which is actionable on its own." *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1061 n.13 (9th Cir. 2002). Accordingly, these "acts are not actionable if time barred, even [if] they are related to" the March 23, 2007, stop. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). Although the pre-March 2007 incidents could still be considered "as evidence of an unconstitutional motive," *RK Ventures, Inc.*, 307 F.3d at 1062, this would still leave the March 23, 2007, stop as the only basis for liability.

chase arose under the Fourteenth Amendment due process rubric, not the Fourth Amendment, since the conduct at issue did not constitute a "search" or "seizure").**[14]**

The district court therefore properly dismissed the Tarabochias' substantive due process claim because, without the March 23, 2007, stop, the claim is untimely.

## IV. CONCLUSION

We recognize the importance of Washington state's interest in promoting the conservation of its fishery and its ability to closely regulate the commercial fishing industry in a manner to further this interest, including by statutorily authorizing tailored warrantless administrative searches. However, the WDFW officers did not conduct their suspicionless stop and search of the Tarabochias' automobile pursuant to any statutory authority. Such suspicionless automobile searches and seizures of commercial fishers, absent express statutory authorization, subject them to "unfettered governmental intrusion," *Prouse*, 440 U.S. at 663—the principal evil against which the Fourth Amendment protects.

In light of the foregoing, we affirm the grant of summary judgment as to Officers Hopkins and Rhoden, and reverse the grant of qualified immunity to Officers Michael Cenci and Dan Chadwick and the related summary judgment dismissal of the Tarabochias' Fourth Amendment claim. We remand

---

**[14]** The Tarabochias' reliance on *A.D.*, 712 F.3d 446, in support of their argument that the March 2007 stop can be analyzed under both the Fourth and Fourteenth Amendments is misplaced. Unlike in *Fontana*, 262 F.3d 871, in *A.D.* we had no occasion to consider the question now before us.

for further proceedings on this claim.  Finally, we affirm the dismissal of the Tarabochias' Fourteenth Amendment substantive due process claim.

**REVERSED in part, AFFIRMED in part, and REMANDED.  Costs on appeal to Appellants.**